No. 92-094

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

CLARENCE MENNIS,

      Claimant and Appellant,

  -vs-

ANDERSON STEEL SUPPLY,

      Employer,
  and

EBI/ORION GROUP,

      Insurer and Respondent.

APPEAL FROM:    The Workers' Compensation Court,
               The Honorable Timothy Reardon, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Randall O. Skorheim, Overfelt Law Firm, Great Falls,
          Montana

      For Respondent:

          Susan J. Rebeck, Attorney at Law, Great Falls,
          Montana

**FILED**

NOV 12 1992

Filed: *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:  August 20, 1992

Decided:  November 12, 1992

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the Workers' Compensation Court, the Honorable Timothy W. Reardon presiding. The Workers' Compensation Court adopted the Findings of Fact and Conclusions of Law and Proposed Judgment of the hearing examiner granting claimant Clarence Mennis (Mennis) permanent total disability benefits and reasonable attorney's fees and costs, but denying domiciliary care benefits. Mennis appeals from that part of the judgment which denied domiciliary care benefits. We affirm.

The issue on appeal is whether the Workers' Compensation Court erred in denying Mennis' claim for domiciliary care benefits pursuant to § 39-71-704, MCA (1983), and the five part test adopted in Carlson v. Cain (1985), 216 Mont. 129, 700 P.2d 607.

Mennis worked in the metal fabrication shop at Anderson Steel Supply (Anderson Steel) as a fabricator and welder. His duties included producing orders, building door frames, fabricating doors, and modifying doors. On February 22, 1985, three steel door frames fell on him and fractured his cheek bones, broke several teeth, separated his right shoulder, and inflicted a traumatic closed head injury. At the time of the accident Anderson Steel was enrolled under Compensation Plan Two of the Workers' Compensation Act and EBI Insurance Company (EBI) was its insurer.

When his shoulder had healed satisfactorily, his doctor released him to return to work. Mennis returned to Anderson Steel on April 24, 1985, in the same position he had before the accident.

2

In August 1985, Mennis complained of lightheadedness and headaches to Dr. Person. Dr. Person referred Mennis to Dr. Labunetz, a neurologist at the Great Falls Clinic, who diagnosed Mennis' condition as "muscle contraction/vascular headaches, post concussive as well as post concussive syndrome." By March 1986, Dr. Labunetz felt that this condition basically had been resolved. In July 1986, Dr. Labunetz referred Mennis to Dr. Shubat, a clinical psychologist, for biofeedback relaxation therapy to help control some continuing pain and for neuropsychological evaluation. Dr. Shubat diagnosed Mennis as suffering from mixed organic brain syndrome. Dr. Shubat referred Mennis to Charles Bock, a speech pathologist, for cognitive retraining. Mennis also received treatment from Dr. David Bush, a psychologist, from March through June of 1987 for what Mennis perceived as personality changes and declining cognitive performance.

In January 1988, Mennis transferred from the fabricating and welding shop to the sales force at Anderson Steel. The noise, dust, and heat of the shop aggravated Mennis' problems caused by the injury. Anderson Steel did not create this position to accommodate Mennis; rather, the position came open and Mennis received a transfer.

In September 1988, Mennis did not return to work at Anderson Steel after undergoing a septoplasty to correct a nasal obstruction that was secondary to the injury caused by the accident. Anderson Steel had informed Mennis that it could not hold his job open because it did not know when he would return after the surgery. He

3

has been unemployed since September 13, 1988.

In July 1989, Mennis' wife Beverly also quit working full time, reducing her hours to six hours a week. She is employed as a legal secretary. Mennis claims she quit working full time at the direction of Drs. Labunetz and Shubat. However, Jeanne Dussault, an independent living specialist who met with the Mennises in March 1990, testified that Beverly had indicated that she wanted to quit working before Mennis' accident to spend more time with the children, and that she reduced her hours because of her needs and to alleviate the stress she felt from working full time and being a full time homemaker.

In order to investigate Mennis' claim, EBI hired Allstate Professional Investigators to observe Mennis. Larry Alexander, the investigator assigned to the case, testified at trial that he first observed Mennis on December 19, 1989. On that day he saw Mennis drive his vehicle to his home, pick up the mail, and enter his home. He again observed Mennis on January 11, 1990. On that day he watched Mennis drive his children to and from school and drive his wife to work. Mr. Alexander also observed Mennis depart in his vehicle and later return on foot.

EBI later hired Putman and Associates to do further surveillance of Mennis. Rick Hawk testified that he first observed Mennis from February 21 to February 24, 1990. During that time he observed Mennis driving his vehicle on numerous occasions, washing the interior and exterior of his vehicle, buying groceries for his children's lunch, and cleaning a storage shed beside his house.

4

Mr. Hawk testified that he never observed a problem with Mennis' driving. Mr. Hawk also observed Mennis from April 15 to April 18, 1990, and saw him drive with no difficulty on those occasions.

Mennis claims that it is necessary for his wife to stay home to provide domiciliary care and that he should receive benefits to pay for her services. The Workers' Compensation Court denied Mennis' claim for domiciliary care benefits finding that he failed to meet the five point test adopted in Carlson for allowing domiciliary care. The issue on appeal is whether the Workers' Compensation Court erred in denying Mennis' claim for domiciliary care pursuant to § 39-71-704, MCA (1983), and the five part test of Carlson.

This Court will not overturn the findings and conclusions of the Workers' Compensation Court where there is substantial credible evidence to support them. Nor will this Court substitute its judgment for that of the Workers' Compensation Court as to the weight of evidence on questions of fact. EBI/Orion Group v. State Compensation Mut. Ins. Fund (1991), 249 Mont. 449, 452, 816 P.2d 1070, 1072 (citing Steffes v. 93 Leasing Co., Inc. (1978) 177 Mont. 83, 86, 580 P.2d 450, 452-453). In this case we are asked to determine whether there is substantial credible evidence to support the Workers' Compensation Court's determination that Mennis is not entitled to domiciliary care benefits under Carlson.

Initially, Mennis' claim to domiciliary care arises out of § 39-71-704(1)(a), MCA (1983), which states:

**Payment of medical, hospital, and related services.**
(1) In addition to the compensation provided by this

5

chapter and as an additional benefit separate and apart from compensation, the following shall be furnished:

> (a) After the happening of the injury, the employer or insurer shall furnish, without limitation as to length of time or dollar amount, reasonable services by a physician or surgeon, reasonable hospital services and medicines when needed, and such other treatment as may be approved by the division for the injuries sustained.

Domiciliary care comes within the "such other treatment" language of the statute. This Court adopted a five point test in Carlson to determine whether in-home services are compensable. Those factors are:

> (1) The employer knows of the employee's need for medical services at home resulting from the industrial injury; (2) the preponderance of credible medical evidence demonstrates that home nursing care is necessary as a result of accident, and describes with a reasonable degree of particularity the nature and extent of duties to be performed by the family members; (3) the services are performed under the direction of a physician; (4) the services rendered are of the type normally rendered by trained attendants and beyond the scope of normal household duties; and (5) there is a means to determine with reasonable certainty the approximate value of the services performed.

Carlson, 700 P.2d at 614.

We subsequently reaffirmed the use of that test in Larson v. Squire Shops, Inc. (1987), 228 Mont. 377, 742 P.2d 1003.

Although the Workers' Compensation Court found that Mennis was permanently totally disabled, it also found that he failed to meet any part of this test, so it denied domiciliary care. As EBI correctly points out, the evidence required to prove permanent total disability is different than that required to justify domiciliary care.

The first element of the Carlson test requires that the

6

employer know of the employee's need for medical services at home as a result of the accident. In his Petition For Hearing and Amended Petition For Hearing, Mennis sought domiciliary care benefits from the date of his injury. The first indication Anderson Steel had that Mennis claimed a need for domiciliary care came in June of 1989 when EBI's attorney received a letter from Mennis' attorney. That letter included copies of letters from Drs. Labunetz and Shubat. In a letter dated May 22, 1989, Dr. Labunetz claimed:

> Domiciliary care or supervision would be important and in fact essential. This would be required constantly unless or until he developed a rigid enough program to function with only spot supervision, though this seems unlikely.

In a letter dated May 24, 1989, Dr. Shubat claimed:

> It is clearly apparent that Beverly Mennis's presence in the home is absolutely paramount. . . . [I]t is still going to require the presence of Beverly in the home to implement these programs in an integrated and consistent manner.

Up to this point, Anderson Steel was justifiably unaware of any need for full time care. As noted previously, Mennis returned to work approximately two months after the accident and worked for approximately two and a half years before not returning after the nasal surgery. His supervisor, Dan Sayre, testified at trial that Mennis had a noticeable sinus problem and complained of the noise, dust, and heat in the shop. These symptoms did not give any indication that Mennis required domiciliary care. Apart from those two problems, Sayre testified that Mennis was a reliable, conscientious worker whose quality of work did not suffer after the accident and who did not require help from others. Nor did Mennis

7

receive any reprimands for his work after the accident.

As evidence that Anderson Steel knew that he needed care, Mennis cites the testimony of his brother-in-law and co-worker, Phillip Warmath, who testified that Mennis became forgetful and needed correcting. Warmath's statements, however, show only occasional difficulty with the job; they are irrelevant to Anderson Steel's knowledge of a need for domiciliary care.

Mennis' return to work and his thirty months of continued employment distinguish this case from Carlson, Larson, and Hilbig v. Central Glass Co. (1989), 238 Mont. 375, 777 P.2d 1296, where the claimants were unable to return to work due to the severity of injuries caused by an industrial accident. Although Mennis may have suffered a permanent total disability, that did not automatically put the employer on notice that he also required domiciliary care. Anderson Steel had no knowledge of any need for domiciliary care during the two and a half years Mennis continued to work or for another nine months after that until the doctors made the claim.

The second element of the test requires that the preponderance of credible medical evidence demonstrate that home nursing care is necessary and that the nature and extent of the duties to be performed by the family members be described with a reasonable degree of particularity. There was much testimony regarding whether Mennis needs care. Mennis argues that the opinions of Drs. Shubat and Labunetz establish his need for domiciliary care. Dr. Shubat's main concerns were that Mennis have structure, have

8

someone to administer his medications, and have someone present during emergencies. However, he admitted that he did not know how Mennis would react in an emergency and that Mennis should be tested and should practice responding to emergencies. Dr. Labunetz admitted that Beverly Mennis could see that Mennis took his medication as directed by administering it in the morning, at lunch, and in the evening when she returned from work.

Dr. Charles Bock found no significant malingering on Mennis' behalf. He felt that even though Beverly's personality is such that other people could provide better therapy for Mennis, she had provided an environment on a day-to-day basis that was optimum for dealing with such problems as his short attention span, distractibility, and limited ability to plan and carry out tasks.

Jeanne Dussault, an independent living specialist, stated that a domiciliary caretaker might have helped Mennis learn some basic homemaking skills during the year that she worked with him (March 1989 to February 1990).

Mennis also retained the services of Dr. Lloyd Cripe, a clinical neuropsychologist, to test him and evaluate the other information gathered on him. Dr. Cripe testified in his deposition that a person with the degree of brain dysfunction Mennis suffered typically does not need attendant care. He stated that on the basis of the neuropsychological test results alone, Mennis would not need attendant care. He did add, however, that Mennis' depression and headaches complicate the situation. In the end, Dr. Cripe deferred to Drs. Shubat and Labunetz on the issue of

9

domiciliary care.

On the other hand, even Dr. Shubat testified that Mennis' "bad" days only meant that he did not have a good day with his children or with himself. Although Dr. Tompkins of the Montana Medical/Legal Panel did not have an opinion as to whether Mennis needed full time care, he did find that Mennis possessed some functional skills, was purposeful, motivated, cooperative, and able to initiate action.

Dr. Bock felt that it is easier for Mennis to sit back and not deal with the complexities of the day, but he did not order domiciliary care. He testified that Mennis could draw up a schedule for the day with his computer program which broke down chores and activities into small tasks. EBI plausibly argues that structuring the day does not require a trained nursing attendant.

Dr. Bush, a psychologist who treated Mennis from March through June of 1987, testified that at that time Mennis was capable of maintaining himself in the home during the day, and that he found it hard to believe that a person with the type of injury Mennis suffered would decline to the point of total invalidism unless he had medical complications leading to severe damage of the central nervous system. In his June 5, 1989, deposition, Dr. Bush was surprised to learn that Mennis requested domiciliary care.

Dr. Lees-Haley, the expert retained by EBI, evaluated Mennis on March 12, 1991, and testified at trial. We note that Mennis made a great effort to discredit Dr. Lees-Haley's credentials and testing. However, Dr. Lees-Haley's extensive curriculum vitae was

10

entered into evidence. Dr. Lees-Haley is a board certified vocational expert, a fellow of the American College of Forensic Psychology, and a diplomate of the American Board of Professional Psychology and the American Board of Vocational Experts. Dr. Tompkins testified in his deposition that he felt Dr. Lees-Haley chose reasonable tests. This Court will not substitute its judgment for that of the Worker's Compensation Court concerning the credibility of witnesses or the weight of their testimony. Smith-Carter v. Amoco Oil Co. (1991), 248 Mont. 505, 510, 813 P.2d 405, 408.

Dr. Lees-Haley found Mennis' claim that he could not do a number of things implausible because of his objective performances on the tests he and other doctors administered and because of Mennis' observable behavior on the day he tested him. As part of his evaluation of Mennis' claim, Dr. Lees-Haley viewed the video surveillance tapes. He testified as follows regarding what he learned from the tapes:

Q. Do you have an opinion on whether or not the videotape behavior of Clarence Mennis was consistent with the cognitive deficits identified by Dr. Shubat?

A. Yes.

Q. What is your opinion?

A. Number one, that he is functioning superior to his functioning as opined by Dr. Shubat. Number two, that he was behaving in a way that was different than Dr. Shubat appears to have believed, based on his own observations and what Mr. Mennis told him. There's a discrepancy between what you learn about Mr. Mennis from Dr. Shubat's record and what you learn from the videotape, and my viewing of the videotape is that he is able to move about, ride a bicycle, drive a car, talk with people, read from a loose-leaf notebook. Apparently he takes a

11

car to the doctor's office [referring to the fact that Mennis took a cab to the Dr.'s office on the day that he was videotaped even though he drove his own car on numerous other occasions that same day]. Putting a variety of things together. But he drove a vehicle with no assistance in the videotape, and he appears to be monitoring children.

I feel that it's inconsistent. That to say a man is so incapacitated he can't be left alone himself without a babysitter for him and see him, in fact, supervising children. He drove a car with a child and assumed responsibility for driving a car with a child in the car, and a woman that I correctly or incorrectly interpreted as being Mrs. Mennis. . . . The ability to move around, ride a bicycle, and drive a car, things like that have some relevance.

Dr. Lees-Haley also found Mennis able to initiate and sustain purposeful activity. He testified as follows:

Q. Do you have an opinion as to whether Clarence Mennis is able to initiate and sustain purposeful activity?

. . .

A. Yes, ma'am.

Q. (By Ms. Rebeck) What is your opinion?

A. That he is able to do so.

Q. On what is your opinion based?

A. Broadly on two things. One is that complete lack of evidence that he can't, and he's an adult man of normal intelligence. Number two, that when he came with me and met with me in the evaluation, when I met him in person, he walked in and did all sorts of things that are consistent with being able to engage in purposeful activity, ranging from little spontaneous things to self-care things like we ordered lunch. He decided what he wanted, he ate, and he answered the questions. He was able to monitor my questions and bring out information. He was able to go to the phone and call for information unassisted. He was able to maintain his train of thought when I interrupted him to see if he was capable of maintaining his train of thought. He was able to take written tests. He was able to ask appropriate questions about the instructions, to clarify things. He was able to accomplish the tests, to begin and continue and

12

complete the tests, answer my complicated and simple questions, understand the questions, and give answers when he needed to. He didn't always know them. There were a few times when he said that he didn't know or didn't remember or didn't understand, but I see no reason to believe this gentleman can't engage in purposeful activity, initiate his own activity. I think he's doing it. I consider the videotape, driving a child in the car, is hardly the inability to do purposeful and dangerous activity.

We note that the surveillance occurred almost a year after Drs. Shubat and Labunetz claimed in their letters that Mennis required domiciliary care. There is substantial credible evidence supporting the Workers' Compensation Court's determination that the need for domiciliary care was not established.

Nor did the request for domiciliary care describe with a reasonable degree of particularity the nature and extent of the duties to be performed by the family members. The Workers' Compensation Court in its Findings of Fact and Conclusions of Law noted that Dr. Labunetz did not prepare a specific plan stating the medical assistance Mennis needed. We find nothing in the record to the contrary.

As we hold that substantial credible evidence exists to justify the Workers' Compensation Court's decision on the first two requirements of the Carlson test, we need not discuss the other elements. The test is clearly a conjunctive test requiring that all elements be satisfied.

Affirmed.

John Conway Harrison
_____
Justice

13

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

14